IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:09-CV-92-D

| | |
|---|---|
| RONNIE WAYNE CRADDOCK, and SHERRIE DENISE HAWKINS, ) ) ) Plaintiffs, ) ) v. ) ) BEAUFORT COUNTY SHERIFF DEPT., ) et al., ) ) Defendants. ) | **ORDER** |

On May 22, 2009, Ronnie Wayne Craddock ("Craddock") and Sherrie Denise Hawkins ("Hawkins") (collectively, "plaintiffs"), proceeding pro se, filed suit under 42 U.S.C. § 1983 [D.E. 1]. Plaintiffs name as defendants the Beaufort County Sheriff's Department ("BCSD"), Beaufort County Sheriff's Office ("BCSO"), Sheriff Alan Jordan, and six deputy sheriffs: Jeremy Wallace, Charles Rose, Nina Shoaf, James Stallings, Keith Owens, and C.R. Smith (collectively, "defendants") [D.E. 1]. On December 10, 2010, defendants filed a motion for summary judgment on all claims [D.E. 30]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified plaintiffs about the motion for summary judgment, the consequences of failing to respond, and the response deadline [D.E. 40]. On December 29, 2010, plaintiffs responded in opposition [D.E. 41–42]. As explained below, the court grants defendants' motion for summary judgment.

I.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party

seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

On May 27, 2006, sheriff's deputies were dispatched to plaintiffs' home on three separate occasions. On the first occasion, Hawkins contacted the BCSO to report that she was having a dispute with Craddock and needed assistance. Stallings Aff. [D.E. 34] ¶ 2. BCSO dispatched defendant Stallings to respond to plaintiffs' residence. Id. Upon arriving at the residence, Craddock invited Stallings inside. Id. Craddock appeared intoxicated and admitted that he and Hawkins had been arguing. Id. Stallings did not see any signs of domestic violence and Hawkins told Stallings that everything was fine. Id. Stallings spoke with plaintiffs for about 10 minutes and then left. Id. Stallings did not have any other interaction with plaintiffs. Id.

Later that afternoon, BCSO received a report of a possible domestic disturbance at plaintiffs' residence and dispatched defendants Wallace and Smith to check on the report. Smith Aff. [D.E. 32] ¶ 2. The dispatcher informed Wallace and Smith that Craddock was intoxicated and taking care of his father, who lived nearby. Id.; see Craddock Aff. 1–6. When Wallace and Smith arrived, they heard yelling inside the residence. Smith Aff. ¶ 3. Wallace and Smith knocked on the door, announced their presence, and were invited into the living room by plaintiffs. Id. Craddock appeared intoxicated; his eyes were glassy, his speech was slurred, and he had a strong odor of

2

alcohol on his breath. Id. Craddock began yelling and cursing at the deputies and asked why they were there. Id. The deputies noticed a gun cabinet nearby, causing them concern for their safety. Id. They asked Craddock to step outside. Id. Craddock started walking toward the gun cabinet, which prompted Smith to draw his taser gun and order Craddock to stop. Id. Craddock warned the deputies that he was a former Navy SEAL. Id. Defendant Smith instructed Craddock to step away from the gun cabinet. Id. Craddock complied and agreed to step outside with the officers. Id. Before going outside, the deputies checked on Craddock's father and spoke to Hawkins. Id. Hawkins reported that Craddock had been drinking and was out of control. Id. Once outside, Craddock calmed down and the deputies advised him to "watch his behavior" the rest of the day. Id. ¶ 4. Smith stated that he was concerned with Craddock's impairment, but saw no basis to charge Craddock with a crime. Id. After speaking with Craddock, Smith and Wallace left the scene. Id.

At about 5:00 p.m. that evening, Craddock called 911, reported that someone was trespassing on his property, and requested assistance. Craddock Aff. 6; Rose Aff. [D.E. 35] ¶ 2; Shoaf Aff. [D.E. 36] ¶ 2. BSCO dispatched defendants Rose and Shoaf to plaintiffs' residence. Rose Aff. ¶ 2; Shoaf Aff. ¶ 2. Before the deputies responded to plaintiffs' residence, deputy Wallace informed Rose about his earlier interaction with Craddock. Rose Aff. ¶ 2; see Shoaf Aff. ¶ 2. Wallace told Rose that Craddock was drunk, acting loudly, and had guns in the residence. Rose Aff. ¶ 2.[1] As Rose and Shoaf approached plaintiffs' residence, they observed clothing strewn along the side of the road. Rose Aff. ¶ 3; Shoaf Aff. ¶ 2. Based on their experience, both Rose and Shoaf considered the situation a potential domestic-violence call. Rose Aff. ¶ 3; Shoaf Aff. ¶ 3. According to Rose and Shoaf, they found Craddock standing in the doorway of the residence. Shoaf Aff. ¶ 3; see Rose Aff. ¶ 4. Rose and Shoaf claim they followed Craddock into the residence after Craddock refused to speak to them outside and invited the deputies inside. Shoaf Aff. ¶ 3; see Rose Aff. ¶ 4.

---

[1] Craddock was known to the BCSO to have a history of domestic violence, alcohol abuse, and altercations with police. See Smith Aff. ¶ 2.

3

According to Craddock, he was cleaning in the kitchen when Rose and Shoaf arrived, and he did not notice the deputies until he saw them stepping through the doorway. Craddock Aff. 6–7. The discrepancy is immaterial. Both sides agree that the deputies were responding to Craddock's 911 call for assistance when they encountered Craddock in his living room. See Rose Aff. ¶¶ 2–4; Shoaf Aff. ¶¶ 2–3; Craddock Aff. 6–7; Hawkins Aff. [D.E. 44] ¶¶ 14–19.

When Craddock saw the officers, he threw his hands up and said "what now?" Craddock Aff. 7. Deputy Rose explained that they were responding to a 911 trespassing complaint. Id. Craddock told the officers that no one was trespassing and asked the officers to leave. Id. The deputies knew that Hawkins also lived at the residence, but they did not see her. Rose Aff. ¶ 4; Shoaf Aff. ¶ 3. The deputies asked Craddock if Hawkins or anyone else was in the residence; Craddock said Hawkins was in the house, but when the deputies asked where Hawkins was, Craddock said it was not important and not to worry about her. Rose Aff. ¶ 4; Shoaf Aff. ¶ 3. Both deputies were concerned for Hawkins's safety, so Rose instructed Shoaf to check the residence for Hawkins. Rose Aff. ¶ 4; Shoaf Aff. ¶ 3. As Shoaf began walking toward the back of the residence, Craddock said "woe, woe, woe, [sic] w[h]ere are you going," and instructed Shoaf to get back into the living room. Craddock Aff. 8. According to the deputies, Craddock said "Get that bitch back in here," and "Tell that bitch to sit down." Rose Aff. ¶ 5; Shoaf Aff. ¶ 3.

Craddock began walking toward Shoaf,[2] and Rose repeatedly instructed Craddock to stop and sit down. Rose Aff. ¶ 5; Shoaf Aff. ¶ 3. Rose threatened to use his taser gun and, when Craddock did not stop, Rose fired his taser gun and struck Craddock in the right side. See Rose Aff. ¶ 5; Shoaf Aff. ¶ 3; Hawkins Aff. ¶ 25. Craddock appeared unfazed by the taser probes; he turned around and began pulling on the taser cords, which pulled the cartridge out of the taser gun. See Rose Aff. ¶ 5; Shoaf Aff. ¶ 3; see also Craddock Aff 10 (stating that the taser probes felt "like [a]

---

[2]Craddock is about 2 inches taller and 55 pounds heavier than Rose, and 10 inches taller and 150 pounds heavier than Shoaf. Rose Aff. ¶ 5.

4

hornet had landed on me and was stinging me."). As Rose radioed for assistance, Craddock told Rose "don't do that again," and Shoaf approached Craddock from behind and attempted to subdue him with pepper spray. Rose Aff. ¶ 5; Shoaf Aff. ¶ 3. Rose also began to spray Craddock with pepper spray, but Craddock did not follow the deputies' orders to get down on the ground. Rose Aff. ¶ 5; Shoaf Aff. ¶ 3. Craddock fell to one knee and the deputies pushed him to the floor and attempted to handcuff him. Rose Aff. ¶ 5; Shoaf Aff. ¶ 3; Craddock Aff. 11. Craddock began kicking and punching, and held one arm close to his body to avoid being handcuffed. Rose Aff. ¶ 5.

Hawkins emerged from another room and repeatedly interfered with the deputies' efforts to handcuff Craddock. Shoaf Aff. ¶ 4; see Pls.' Mem. Opp'n Mot. Summ. J., Ex. 2 at 3 (hereinafter "Shoaf Narrative Report"). Shoaf eventually handcuffed Hawkins and took her outside for her own safety. Shoaf Aff. ¶ 4; see Shoaf Narrative Report. Shoaf then returned to assist Rose in handcuffing Craddock. Shoaf Aff. ¶ 4; Rose Aff. ¶ 5. After the deputies placed Craddock in handcuffs, several other officers arrived at plaintiffs' residence. See Rose Aff. ¶ 5; Shoaf Aff. ¶ 5. The officers carried Craddock outside to get away from a lingering cloud of pepper spray in the residence. Rose Aff. ¶ 5. The officers had to carry Craddock outside because he would not move on his own. Rose Aff. ¶¶ 5–6; Shoaf Aff. ¶ 5.[3] Shoaf removed Hawkins's handcuffs because plaintiffs' dog was trying to bite Rose and Shoaf. See Shoaf Narrative Report. Hawkins told Rose and Shoaf to "go easy" on Craddock, because he had been drinking alcohol and using drugs all day. Rose Aff. ¶ 6; Shoaf Aff. ¶ 4. Shoaf then told Hawkins to go back inside the residence, but Hawkins refused and continued to interfere. See Shoaf Narrative Report; Hawkins Aff. ¶ 31. Shoaf grabbed Hawkins by the arm and attempted to take Hawkins back into the house, but Hawkins resisted and fell on the steps. Hawkins Aff. ¶¶ 31–32. After Hawkins fell, Shoaf pulled Hawkins back up on

---

[3] After Craddock was in handcuffs, defendant Owens arrived as backup. Owens Aff. ¶ 2. However, Owens did not have any contact with Craddock or Hawkins. Id.

5

her feet, took her inside the residence, and ordered her to stay inside. Id. ¶¶ 32–33. Shoaf and Rose did not take Hawkins into custody because they were covered in pepper spray and were more concerned with getting Craddock to the Beaufort County Jail. See Shoaf Narrative Report.

Once outside, Craddock stopped resisting the officers. Rose Aff. ¶ 6. Craddock did not appear to have any injuries and was not complaining about any injuries. Id. After arresting Craddock, Rose seized three firearms from the residence upon learning that Craddock had a domestic violence conviction in Edgecombe County which made it illegal for him to possess firearms. Rose Aff. ¶ 8.[4]

Rose and Shoaf placed Craddock in the patrol car, took him to the Beaufort County Jail, and charged Craddock with assault on a government official and resisting, obstructing, and delaying an officer. Rose Aff. ¶ 6; Shoaf Aff. ¶ 5.[5] On the drive to Beaufort County Jail, Shoaf and Rose observed Craddock to make sure he was not having trouble breathing. Shoaf Narrative Report. At the jail, Rose washed the pepper spray off of Craddock and, at Craddock's request, took photographs of Craddock and placed them in the arrest file. Rose Aff. ¶ 6. Later that night, Shoaf obtained an arrest warrant from a magistrate charging Hawkins with resisting, obstructing, and delaying an officer. Shoaf Aff. ¶ 6. On May 28, 2006, Wallace and Smith returned to plaintiffs' residence and executed Hawkins's arrest warrant without incident. Smith Aff. ¶ 5.[6]

On May 22, 2009, plaintiffs filed suit against defendants for violating their rights under the Second, Fourth, and Fourteenth Amendments to the United States Constitution, and the Declaration

---

[4] Craddock was charged by another deputy with violating federal law, and his case was referred to the U.S. Attorney's Office for prosecution. Rose Aff. ¶ 8. On August 6, 2009, Craddock was indicted for unlawfully possessing the firearms. See United States v. Craddock, 4:09-CR-70-BO, [D.E. 1] (E.D.N.C. Aug. 6, 2009). On November 13, 2009, the United States dismissed the indictment. See id., [D.E. 18].

[5] The charges against Craddock were later dismissed. Rose Aff. ¶ 7; see Craddock Aff. 14.

[6] The charge against Hawkins was later dismissed. Shoaf Aff. ¶ 6; see Hawkins Aff. ¶ 41.

of Independence. Compl. 1. Plaintiffs allege that defendants unlawfully entered their home without a warrant, lacked probable cause to arrest plaintiffs, used excessive force in executing the arrests, falsely arrested plaintiffs, were deliberately indifferent to plaintiffs' serious medical needs, and unlawfully seized Craddock's father's firearms. See id. 2-3. Defendants have moved for summary judgment, arguing they did not violate plaintiffs' constitutional rights. See Defs.' Mem. Supp. Mot. Summ. J. [D.E. 31] 7. Defendants, in their individual capacities, argue that they are entitled to qualified immunity. See id. 7-18. Defendants also argue that plaintiffs' claims against defendants in their official capacity fail as a matter of law. See id. 24-26. The court addresses plaintiffs' claims seriatim.

II.

"To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Additionally, a section 1983 plaintiff must allege the personal involvement of a defendant. See, e.g., Ashcroft v. Iqbal, 129 S. Ct. 1937, 1948-49 (2009); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-92 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

A.

As for the claims against the individual officers, the doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Brandon v. Holt, 469 U.S. 464, 472-73 (1985). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Pearson v. Callahan, 555 U.S. 223, 231-32 (2009). Qualified

7

immunity protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005); Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991) (emphasis removed); see Pearson, 555 U.S. at 231.

The court must ask two questions to determine whether qualified immunity applies. See, e.g., Pearson, 555 U.S. at 232; Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009). First, "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232. Second, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. Courts have discretion to decide which of the two prongs should be addressed first. Id. at 236. Thus, defendants are entitled to qualified immunity if the answer to either question is "no." See, e.g., Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011); Brockington, 637 F.3d at 506.

As for the "clearly established right" prong,

> the right the official is alleged to have violated . . . must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Saucier v. Katz, 533 U.S. 194, 202 (2001) (quotations and citations omitted), overruled on other grounds by Pearson, 555 U.S. at 227; see, e.g., Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009). In Wilson v. Layne, 141 F.3d 111 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999), the Fourth Circuit held that for a plaintiff to prevail over the defense of qualified immunity, the right at issue must have been "authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." 141 F.3d at 114

8

Case 4:09-cv-00092-D Document 45 Filed 09/26/11 Page 8 of 20

(quotation omitted). When the Supreme Court affirmed the Fourth Circuit's decision in Layne, it observed that plaintiffs had not brought to the Court's attention any cases "of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely, nor have they identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." 526 U.S. at 617.

In most cases, the qualified-immunity analysis does not require factual findings, because the inquiry is a "purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law." Mitchell v. Forsyth, 472 U.S. 511, 528 n.9 (1985). When asserting qualified immunity at summary judgment, however, a defendant may challenge the adequacy of the evidence to support the complaint's allegations. See, e.g., Cloaninger, 555 F.3d at 331. A defendant is entitled to summary judgment if the record does not create a genuine issue of material fact as to whether defendant committed the acts alleged in the amended complaint. See, e.g., Mitchell, 472 U.S. at 526; Cloaninger 555 F.3d at 331.

First, plaintiffs claim that defendants unlawfully entered their residence without a warrant, in violation of the Fourth Amendment. Compl. 1. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Accordingly, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980) (quotation omitted). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City v. Stuart, 547 U.S. 398, 403 (2006).

Two exceptions are relevant to plaintiffs' claims. First, the Supreme Court has long recognized that an individual's knowing and voluntary consent serves as a "constitutionally permissible and wholly legitimate aspect of effective police activity." Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973). Thus, the knowing and voluntary consent of an occupant who has, or is

9

reasonably believed to have, authority over the property constitutes an exception to the Fourth Amendment's warrant requirement. See, e.g., Illinois v. Rodriguez, 497 U.S. 177, 181, 188–89 (1990); United States v. Matlock, 415 U.S. 164, 170 (1974); United States v. Buckner, 473 F.3d 551, 553–54 (4th Cir. 2007).

Second, a police officer also may search a home without a warrant if "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 394 (1978) (quotation omitted); Hunsberger v. Wood, 570 F.3d 546, 553 (4th Cir. 2009). In analyzing whether exigent circumstances justify a warrantless entry, the court considers "whether the circumstances would cause an officer to have an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'" United States v. Hill, No. 10-4320, 2011 WL 3626788, at *5 (4th Cir. Aug. 18, 2011) (quoting United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992)). Examples of such emergencies include a "risk of danger to the police or to other persons inside or outside the dwelling." United States v. Moses, 540 F.3d 263, 270 (4th Cir. 2008) (quotation omitted).

As for deputy Stallings's first entry, the evidence establishes that Craddock invited Stallings inside the residence. Stallings Aff. ¶ 2. Plaintiffs have offered no evidence or argument to the contrary. Thus, Stallings's entry was based on plaintiffs' consent and was lawful. See, e.g., Rodriguez, 497 U.S. at 188–89.

As for the second entry of deputies Wallace and Smith, the evidence establishes that plaintiffs invited Wallace and Smith inside the residence. Smith Aff. ¶ 3. Again, plaintiffs have offered no evidence or argument to the contrary. Thus, the entry was based on plaintiffs' consent and was lawful. See, e.g., Rodriguez, 497 U.S. at 188–89.

As for the alleged unlawful entry of Rose and Shoaf, defendants rely on the exigent-circumstances doctrine. See Defs.' Mem. Supp. Mot. Summ. J. 11–12. The evidence shows that

10

Rose and Shoaf were responding to Craddock's 911 call. Before responding to the call, Rose had spoken to deputy Wallace about his earlier interaction with Craddock. Thus, Rose already knew that Craddock was drunk, acting loudly, and had guns in the residence. As Rose and Shoaf approached the residence, they observed clothing strewn along the road, which led both deputies to believe they were responding to a domestic-violence dispute. At the residence, an intoxicated Craddock confronted the deputies. Both Rose and Shoaf knew that Hawkins lived at the residence, but they did not see her. When the deputies asked about Hawkins's whereabouts, Craddock did not respond. Based on their observations and their knowledge of Wallace's earlier encounter with Craddock, the officers reasonably believed Hawkins was in danger. See, e.g., Hunsberger, 570 F.3d at 555–56; Cloaninger, 555 F.3d at 334. "[C]onfronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, [defendants were] authorized to act on that information, even if found erroneous." Hunsberger, 570 F.3d at 556 (quotation omitted). Thus, exigent circumstances justified Rose and Shoaf's entry. See, e.g., Moses, 540 F.3d at 270–71. Accordingly, defendants are entitled to qualified immunity. See, e.g., Hunsberger, 570 F.3d at 555–57.

Second, plaintiffs claim that defendants seized them in violation of the Fourth Amendment. "A warrantless arrest of an individual . . . [for] a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." Maryland v. Pringle, 540 U.S. 366, 370 (2003). To prevail on a section 1983 claim alleging a violation of the Fourth Amendment due to an unlawful arrest, plaintiffs must demonstrate that the arrest was not supported by probable cause. See, e.g., Miller v. Prince George's County, 475 F.3d 621, 627 (4th Cir. 2007).[7]

---

[7] Plaintiffs also claim they were falsely arrested by defendants. The two claims are analogous and require the same analysis. See, e.g., Brooks v. City of Winston-Salem, 85 F.3d 178, 181–82 (4th Cir. 1996) ("At common law, allegations that a warrantless arrest or imprisonment was not supported by probable cause advanced a claim of false arrest or imprisonment.").

11

Probable cause for arrest exists if:

> at the moment the arrest was made . . . the facts and circumstances within [the officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense.

Beck v. Ohio, 379 U.S. 89, 91 (1964); see Wilson v. Kittoe, 337 F.3d 392, 398 (4th Cir. 2003); Bostic, 667 F. Supp. 2d at 607. The court considers the totality of the circumstances when determining if probable cause existed. Illinois v. Gates, 462 U.S. 213, 241–46 (1983); United States v. Dickey-Bey, 393 F.3d 449, 453–54 (4th Cir. 2004). "[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Pringle, 540 U.S. at 370 (quotations omitted); see Dickey-Bey, 393 F.3d at 453–54; Gomez v. Atkins, 296 F.3d 253, 262 (4th Cir. 2002); Bostic, 667 F. Supp. 2d at 607. Thus, the court must balance protecting "citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime," with providing law enforcement officers with "fair leeway for enforcing the law in the community's protection." Pringle, 540 U.S. at 370 (quotations omitted). In evaluating objective reasonableness, what the officer observed is highly relevant; his subjective beliefs are not. See, e.g., Devenpeck v. Alford, 543 U.S. 146, 153 (2004); Bostic 667 F. Supp. 2d at 607.

The court begins with the question of whether defendant Rose and Shoaf's arrest of Craddock violated Craddock's Fourth Amendment right to be free from a warrantless arrest absent probable cause. Rose and Shoaf contend they had probable cause to arrest Craddock for willfully and unlawfully resisting, delaying, or obstructing a public officer in discharging or attempting to discharge a duty of his office in violation of N.C. Gen. Stat. § 14-223. See Defs.' Mem. Supp. Mot. Summ. J. 15–16, 19–20.

Pursuant to section 14-223, "[i]f any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be

12

guilty of a Class 2 misdemeanor." N.C. Gen. Stat. § 14-223. The elements of the offense are:

1) that the victim was a public officer;
2) that the [arrestee] knew or had reasonable grounds to believe that the victim was a public officer;
3) that the victim was discharging or attempting to discharge a duty of his office;
4) that the [arrestee] resisted, delayed, or obstructed the victim in discharging or attempting to discharge a duty of his office; and
5) that the [arrestee] acted willfully and unlawfully, that is intentionally and without justification or excuse.

State v. Sinclair, 191 N.C. App. 485, 488–89, 663 S.E.2d 866, 870 (2008). Section 14-223's purpose is "to enforce orderly conduct in the important mission of preserving the peace, carrying out the judgments and orders of the court, and upholding the dignity of the law." State v. Leigh, 278 N.C. 243, 251, 179 S.E.2d 708, 713 (1971). The statute "is concerned with acts threatening a public officer with injury only insofar as they interfere with the performance of his official duties." State v. Hardy, 298 N.C. 191, 197, 257 S.E.2d 426, 430 (1979). An individual need not engage in physical violence or permanently impede an officer's duties in order to violate N.C. Gen. Stat. § 14-223. See State v. Burton, 108 N.C. App. 219, 225, 423 S.E.2d 484, 488 (1992).

Here, Shoaf and Rose were attempting to determine the whereabouts of Hawkins and ensure that she was not injured. Rose directed Shoaf to check the residence to find Hawkins. Craddock yelled and cursed at Shoaf, instructed her to stop and come back into the living room, and then began to walk towards Shoaf. Rose ordered Craddock to stop and sit down, but Craddock did not heed Rose's order. Based on these facts, Rose and Shoaf had probable cause to believe that Craddock was resisting, delaying, or obstructing the performance of the officers' official duties in violation of section 14-223. See, e.g., State v. Kaley, 711 S.E.2d 531, 2011 WL 1238368, at *5 (N.C. Ct. App. Apr. 5, 2011) (unpublished table decision); State v. Kizer, 692 S.E.2d 195, 2010 WL 916343, at *4 (N.C. Ct. App. Mar. 16, 2010) (unpublished table decision). Therefore, Rose and Shoaf's seizure and arrest of Craddock was objectively reasonable and supported by probable cause.

As for Shoaf's initial arrest of Hawkins, the evidence indicates that Hawkins interfered with

13

back and pushed her into the bedroom three times while the deputies attempted to subdue Craddock. See Shoaf Narrative Report. Eventually, Shoaf placed Hawkins in handcuffs and took her outside for her own safety. Id. Based on these facts, Shoaf had probable cause to believe Hawkins was resisting, delaying, or obstructing the performance of her official duties in violation of section 14-223. Therefore, Shoaf's temporary seizure of Hawkins was objectively reasonable.

As for Smith and Wallace's subsequent arrest of Hawkins pursuant to a warrant, "a public official cannot be charged with false arrest when he arrests [an individual] pursuant to a facially valid warrant." Porterfield v. Lott, 156 F.3d 563, 568 (4th Cir. 1998). Therefore, Hawkins's claim against Smith and Wallace fails.

Third, plaintiffs claim that defendants used excessive force. The Fourth Amendment protects citizens from excessive force during arrest. See, e.g., Graham v. Connor, 490 U.S. 386, 395 (1989); Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009); Young v. Prince George's County, 355 F.3d 751, 758 (4th Cir. 2004); Bostic, 667 F. Supp. 2d at 613. To determine whether an officer's use of force was excessive, the court employs a "reasonableness" test. See, e.g., Graham, 490 U.S. at 396; Valladares, 552 F.3d at 388. The court looks to the objective reasonableness of the officer's actions, rather than the subjective motivations of the officer. See, e.g., Graham, 490 U.S. at 397; Young, 355 F.3d at 758–59.

The reasonableness test under the Fourth Amendment is not "capable of precise definition." Bell v. Wolfish, 441 U.S. 520, 559 (1979). Rather, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Young, 355 F.3d at 757. In particular, the court must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Further, the court may consider the extent of the plaintiffs injury. See Jones, 325 F.3d at 527.

14

"In evaluating these factors, the court must not engage in Monday-morning quarterbacking, but instead should consider that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain and rapidly evolving—about the amount of force that is necessary in a particular situation.'" Bostic, 667 F. Supp. 2d at 613 (quoting Park v. Shiflett, 250 F.3d 843, 853 (4th Cir. 2001)); see also Graham, 490 U.S. at 396–97.

The court has considered the Graham factors in light of the record. As for Craddock, Rose and Shoaf's actions were objectively reasonable. As noted, Shoaf and Rose were attempting to locate Hawkins because they were concerned for her safety. As Shoaf began to look for Hawkins, Craddock demanded that Shoaf return to the living room and then Craddock began to walk after Shoaf. Rose knew that there were firearms in the residence. Craddock, who appeared intoxicated, is about 10 inches taller and 150 pounds heavier than Shoaf and 2 inches taller and 55 pounds heavier than Rose. Rose ordered Craddock to stop and sit down and threatened to use his taser gun, but Craddock ignored Rose's order. Rose fired his taser gun at Craddock, but the taser did not appear to have any effect and Craddock pulled the prongs out of his side. Shoaf and Rose then proceeded to spray Craddock with pepper spray to subdue him. The officers continued to order Craddock to get down on the ground and had to physically restrain him. Once on the ground, Craddock continued to resist by kicking and punching the officers. Thus, through his own active resistance, Craddock posed a known, immediate threat of physical harm to the law enforcement officers, himself, and the public. After considering defendants' behavior in effecting the arrest and considering the totality of the circumstances, defendants' use of force in subduing and arresting Craddock was not excessive. See, e.g., Graham, 490 U.S. at 396; Slattery, 939 F.2d at 216.

As for Hawkins, she claims that Shoaf grabbed her arm and forced her inside the residence, which caused her to fall on the steps and injure her back. Hawkins Aff. ¶¶ 31–33. Shoaf, however, only grabbed Hawkins's arm and forced her inside after Hawkins refused to follow Shoaf's order. Id. ¶ 31. Thus, as Hawkins admits, Shoaf's use of force was in direct response to Hawkins'

15

resistance. Notably, Hawkins does not allege that Shoaf used a taser gun or pepper spray to restrain her. Given the need to restore order and ensure officer safety during Craddock's arrest, Shoaf's use of force was objectively reasonable and not excessive. See, e.g., Graham, 490 U.S. at 396; Slattery, 939 F.2d at 216.

Fourth, plaintiffs claim that defendants provided them with inadequate medical care. To state a section 1983 claim for inadequate medical care, a state pretrial detainee must show deliberate indifference to his or her serious medical needs in violation of his Fourteenth Amendment due process rights. See, e.g., Bell, 441 U.S. at 535 n.16; Estelle v. Gamble, 429 U.S. 97, 104 (1976); Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001); Hill v. Nicodemus, 979 F.2d 987, 991–92 (4th Cir. 1992). In order to prove such a claim, plaintiffs "must demonstrate that the officers acted with 'deliberate indifference' (subjective) to [their] 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Estelle, 429 U.S. at 104). The objective prong requires plaintiffs to allege "a serious medical need," which is one that has been diagnosed by a physician or one so obvious that a lay person would recognize the necessity of a doctor's attention. Iko, 535 F.3d at 241. As for the subjective prong, "deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Deliberate indifference requires that an official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997); see Farmer, 511 U.S. at 837.

As for Craddock, he claims that he injured his "head, neck, right arm, [and] right knee" during the altercation with Rose and Shoaf. Craddock Aff. 11. At the Beaufort County Jail, Rose took pictures of Craddock at Craddock's request. Id. at 12. However, Craddock has not presented any evidence of the injuries he sustained beyond the bare assertion that he was injured. There is no evidence that Craddock requested medical care while at the jail. Moreover, Rose and Shoaf both

evidence that Craddock requested medical care while at the jail. Moreover, Rose and Shoaf both observed Craddock, and stated that he did not have any visible injuries. See Rose Aff. ¶ 6; Shoaf Narrative Report. As for Hawkins, she claims that she injured her back when Shoaf caused her to fall on the steps of her residence. Hawkins Aff. ¶¶ 31–32. Shoaf then forced Hawkins to get up, step inside the residence, and sit down. Id. ¶¶ 32–33. By Hawkins's own account, she was still able to stand up and walk, and she did not complain about any injury to the deputies. See id. ¶¶ 32–39. In short, plaintiffs have failed to demonstrate any evidence of an objectively serious injury, or that defendants were deliberately indifferent to such a condition. See, e.g., Iko, 535 F.3d at 241; Young, 238 F.3d at 575–76; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Therefore, plaintiffs' claims for inadequate medical care fail.

Fifth, Craddock claims that Rose violated the Second Amendment rights of his father, William H. Craddock, when Rose seized three firearms from the residence. See Pls.' Mem. Opp'n Mot. Summ. J. 24–25; id. Ex. 5 ("Affidavit of William H. Craddock"). However, Craddock lacks standing to assert a claim on behalf of his father. A plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975); Smith v. Frye, 488 F.3d 263, 272 (4th Cir. 2007); cf. Rakas v. Illinois, 439 U.S. 128, 133–34 (1978). Therefore, plaintiffs' Second Amendment claim fails.

Alternatively, to the extent Craddock claims his own rights were violated, the claim still fails. "[T]he right secured by the Second Amendment is not unlimited." District of Columbia v. Heller, 554 U.S. 570, 626 (2008). Section 922(g)(9) makes it "unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence . . . [to] possess in or affecting commerce, any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(9); see United States v. Hayes, 129 S. Ct. 1079, 1082 (2009).

Here, Rose seized the firearms on May 27, 2006, after learning that Craddock had a domestic violence conviction and was not eligible to possess firearms under 18 U.S.C. § 922(g)(9). Rose Aff.

17

¶ 8. Therefore, it was objectively reasonable for Rose to believe that Craddock was not eligible to possess firearms, and he is entitled to qualified immunity. See, e.g., Slattery, 939 F.2d at 216; see also United States v. Kelly, 276 F. App'x 261, 265 (4th Cir. 2007) (per curiam) (unpublished).

B.

As for plaintiffs' claim under the Declaration of Independence, "[t]he Declaration of Independence is a statement of ideals, not law." Schifanelli v. United States Gov't, 865 F.2d 1259, 1988 WL 138496, at *1 (4th Cir. Dec. 22, 1988) (per curiam) (unpublished table decision). Therefore, plaintiffs' section 1983 claim based on the Declaration of Independence fails. Id.; see Rondeau v. Rogers, No. 09-CV-402-JL, 2010 WL 3070192, at *3 (D.N.H. July 8, 2010) (unpublished); Petitio v. Hill, No. CV-04-4493(SJF)(ARL), 2007 WL 1016890, at *11 (E.D.N.Y. Mar. 26, 2007) (unpublished).

C.

As for plaintiffs' claims against Sheriff Jordan, Sheriff Jordan was not personally involved in any of the events that transpired at plaintiffs' residence. However, a plaintiff may proceed against an official in his supervisory capacity by showing an "affirmative link" between the misconduct of the subordinate employees and the actions or inactions of the supervisory defendant. Rizzo v. Goode, 423 U.S. 362, 371 (1976). The causal link is necessary because there is no respondeat superior liability under section 1983. See, e.g., Iqbal, 129 S. Ct. at 1948–49.

To establish supervisory liability under section 1983, plaintiffs must establish three things:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff[s]; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994); see Iqbal, 129 S. Ct. at 1949. The subordinate's conduct must be "pervasive," meaning that "the conduct is widespread, or at least has been used on

several different occasions and that the conduct engaged in by subordinate poses an unreasonable risk of harm of constitutional injury." Shaw, 13 F.3d at 799. Thus, a constitutional violation is necessary in order for plaintiffs to state a claim against a supervisory defendant, but it is not sufficient. See, e.g., Waybright v. Frederick County, 528 F3d 199, 203–04 (4th Cir. 2008).

As discussed, plaintiffs have failed to establish the violation of a constitutional right; therefore, plaintiffs' claims against Sheriff Jordan in his supervisory capacity fail. See id. Moreover, even if plaintiffs could show a constitutional violation, plaintiffs have failed to show that Sheriff Jordan was aware of the risk of constitutional injury, that his response was so inadequate as to show deliberate indifference, or that there is a causal link between Sheriff Jordan's inaction and the plaintiffs' alleged injury. See, e.g., Shaw, 13 F.3d at 799. Therefore, plaintiffs' claims against Sheriff Jordan in his supervisory capacity fail.

Likewise, to the extent plaintiffs seek to proceed against Sheriff Jordan in his official capacity as the Sheriff of Beaufort County, plaintiffs' claims also fail. A municipality is only liable under section 1983 if it causes a constitutional deprivation through an official policy or custom. Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999); see, e.g., Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403–04 (1997). This requirement limits municipal liability under section 1983 to those actions for which the municipality is actually responsible by distinguishing between acts attributable to the municipality and acts attributable only to municipal employees. See, e.g., Bd. of Cnty. Comm'rs, 520 U.S. at 403–04. Plaintiffs claims do not establish the deprivation of a constitutional right or that any alleged deprivation was due to an official policy or custom.

D.

Plaintiffs have also named the BCSO and BCSD as defendants. "State law dictates whether a [state] governmental agency has the capacity to be sued in federal court." Efird v. Riley, 342 F. Supp. 2d 413, 419–20 (M.D.N.C. 2004); see, e.g., Avery v. County of Burke, 660 F.2d 111, 113–14 (4th Cir. 1981). "For example, N.C. Gen. Stat. § 153A-11 acknowledges that a county is a legal

entity which may be sued. However, there is no corresponding statute authorizing suit against a North Carolina county's sheriff's department." Parker v. Bladen County, 583 F. Supp. 2d 736, 740 (E.D.N.C. 2008). Accordingly, the BCSO and BCSD lack legal capacity to be sued. See id.; Efird, 342 F. Supp. 2d at 419–20. Thus, plaintiffs' claims against the BCSO and BCSD fail as a matter of law.

III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 30]. The clerk is DIRECTED to close this case.

SO ORDERED. This 26 day of September 2011.

JAMES C. DEVER III
United States District Judge